Filed 9/30/24  P. v. Cortes CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| THE PEOPLE, | B333183 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA099348) |
| v. | |
| VANESSA CORTES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Amy N. Carter, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

Vanessa Cortes appeals from her judgment of conviction of one count of felony child abuse (Pen. Code,[1] § 273a, subd. (a)) with a true finding that she personally inflicted great bodily injury on the victim (§ 12022.7, subd. (d)). Cortes's appellate counsel filed a brief asking this court to proceed under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). We affirm.

In an amended information, Cortes was charged with one count of felony child abuse (§ 273a, subd. (a); count 1), and one count of assault on a child under the age of eight resulting in a comatose state or permanent paralysis (§ 273ab, subd. (b); count 2). As to count 1, it was alleged that Cortes personally inflicted great bodily injury on a child under the age of five (§ 12022.7, subd. (d)). As to both counts, it was alleged that the offenses involved great violence or bodily harm, the victim was particularly vulnerable, Cortes took advantage of a position of trust, and Cortes engaged in violent conduct indicating a serious danger to society (Cal. Rules of Court, rule 4.421(a)(1), (a)(3), (a)(11) and (b)(1)). The case was tried to a jury starting in May 2023.

The evidence at trial showed that, on February 22, 2018, six-month-old Amber G. was hospitalized with a catastrophic brain injury after being left in the care of Cortes. At the time of the injury, Cortes had been babysitting Amber for a few months while the child's mother, S.G., was at work. S.G. testified that, prior to the injury, Amber was a healthy baby with no history of medical issues.

---

[1]     Unless otherwise stated, all further statutory references are to the Penal Code.

On the night of February 21, 2018, Amber's maternal grandmother and aunt spent time with the child, and did not notice any health concerns. The following morning, S.G.'s then boyfriend, Jonathan Flores, saw Amber in her crib, and thought that she seemed fine. Flores was alone with Amber for about a half hour that morning while S.G. got ready for work.

On February 22, 2018, sometime after 6:00 a.m., S.G. drove Amber to Cortes's home. S.G. believed Amber was behaving normally that morning, and did not appear to be in any pain. Amber fell asleep in the car, and was still sleeping when S.G. left her with Cortes. Cortes's husband, Jose Galvan, was at home at the time. When Galvan left for work at around 7:45 a.m., he did not notice anything wrong with Amber.

Later that day, at about 12:45 p.m., Galvan returned home for lunch. He saw Cortes crying on the living room floor, and Amber lying on the couch with her eyes closed. Cortes told Galvan that Amber was not responding to her. When Galvan went to check on Amber, it was obvious to him that something was wrong with the child. He immediately told Cortes that he was going to call 911. In response, Cortes said, "No, because they're going to put me in jail." Because Galvan believed the couple did not have cell phone service due to an unpaid bill, he went outside to borrow the gardener's phone. Galvan called 911 at 1:19 p.m.

Paramedics arrived at the scene at 1:23 p.m. At that time, Amber was lethargic, her heart rate was erratic, and her skin was slightly blue due to a lack of oxygen. En route to the hospital, the child appeared to be gravely ill, and she began having involuntary spasms indicative of a brain injury.

3

Dr. Lourdes Escalona, a pediatric emergency room physician, treated Amber at the hospital. By that point, the child was close to death. She was having difficulty breathing, and was actively having a seizure. A CT scan of her head showed that Amber suffered a skull fracture and bleeding in her brain. Dr. Escalona did not know what caused Amber's injury or when it occurred, but believed it likely happened not long before the child arrived at the hospital.

Dr. Bonnie Rachman, a pediatric critical care physician, treated Amber upon her transfer to the pediatric intensive care unit. When Dr. Rachman first saw Amber on February 22, 2018, the child was critically ill. She required a ventilator to help her breathe, and she was at risk for further seizures and brain swelling. The next day, Dr. Rachman spoke with a social worker from the Los Angeles County Department of Children and Family Services. According to Dr. Rachman, the social worker pressured her to provide a timeframe for Amber's head injury even though she explained it was not her area of expertise. Dr. Rachman estimated to the social worker that the injury occurred between one and 24 hours before Amber arrived in the emergency room. She did not know whether the injury was the result of an accident or child abuse.

Dr. Megan Langille, a pediatric neurologist, first saw Amber as a consult after she was admitted into the pediatric intensive care unit. Dr. Langille diagnosed Amber with a severe brain injury. An MRI of the child's brain showed a skull fracture, subdural hematomas, and subarachnoid hemorrhaging. It also showed that Amber suffered strokes on both the left and right frontal areas of her brain, and experienced a shearing of the axons, or nerve cells, of the brain. In addition, Amber had retinal

4

hemorrhages in both eyes that left her permanently blind. Dr. Langille opined that Amber's injury would have had to occur close in time to her arrival at the hospital in order for her to survive. She further opined that Amber would have become symptomatic within one to two hours of sustaining the injury, and that a layperson would have been able to observe those symptoms. Dr. Langille has continued to care for Amber in the outpatient clinic for the past several years. Five years after her injury, Amber has the functionality of a two-month-old infant, and cannot walk, sit, or eat on her own. She requires a feeding tube, suffers from spasticity in her extremities, and experiences daily seizures. Amber has not improved in any meaningful way since she sustained the injury, and she will remain in her current condition for her whole life.

Dr. Anastasia Feifer, a child abuse pediatrician, testified as an expert witness for the prosecution. As described by Dr. Feifer, it is common for children who suffer abusive head trauma to present with such injuries as subdural hematomas, retinal hemorrhages, shearing and swelling of the brain, strokes, and skull fractures. Dr. Feifer examined Amber on February 22, 2018 after the child was admitted to the hospital. Amber's CT and MRI scans showed severe bilateral subdural hematomas, extensive retinal hemorrhaging, a shearing injury, stroke damage, and a skull fracture. Dr. Feifer opined that Amber's injuries were caused by abusive head trauma based on the totality of findings in her brain imaging and her clinical presentation. Dr. Feifer also opined that Amber likely would have displayed immediate symptoms after she was injured, and that those initial symptoms would have been obvious to a layperson. Dr. Feifer estimated that Amber suffered abusive

5

head trauma one to three hours before she was brought to the hospital. Dr. Feifer believed Amber would have died within a few hours of sustaining her injuries if she had not received lifesaving medical treatment.

Dr. Charles Niesen, a specialist in child neurology, testified as an expert witness for the defense. Dr. Niesen did not treat Amber, but he reviewed her medical records. According to Dr. Niesen, the child's initial CT scan showed minimal subdural bleeding and mild brain swelling. Dr. Niesen opined that it takes time for swelling from a brain injury to develop, and that the swelling in Amber's case would have occurred a minimum of four to five hours after the child sustained her injury. Dr. Niesen further opined that Amber's swelling was the result of a lack of blood flow to the brain, which could have been caused by a seizure, an infection, or an injury inflicted on the child before she was left with Cortes. Dr. Niesen was familiar with the type of brain injury known as shaken baby syndrome. He believed Amber's subdural bleeding was not consistent with that type of injury. Dr. Niesen also believed it could not reasonably be determined what type of injury would result based on the number of times that a baby was shaken or the amount of force used.

Cortes's cell phone records showed there were outgoing calls from her phone on the day Amber was hospitalized. During an interview with the police, Cortes admitted that she was aware she could call 911 even if her cell phone did not have service, and that she could have called 911 "[a]t any time." Cortes also admitted that she knew she "messed up" by not calling 911, and that she did not do so because she "was scared." When told that Amber "could be more severely damaged" as a result of her failure to call 911, Cortes replied, "I'm aware of that." When told

that such neglect was itself a crime, Cortes stated, "Okay. Then . . . I take full responsibility for that but this is the story . . . this is the truth. This is what happened. She dropped her off. She was nonresponsive. Her body was responding to me, but she wouldn't open her eyes. This is the truth."

At the conclusion of the trial, the jury found Cortes guilty on count 1 of felony child abuse in violation of section 273a, subdivision (a). As to that count, the jury found true the allegation that Cortes personally inflicted great bodily injury on Amber within the meaning of section 12022.7, subdivision (d). The jury was unable to reach a verdict on count 2, and the trial court declared a mistrial as to that count. Cortes waived her right to a jury trial on the aggravating factor allegations.

At Cortes's sentencing hearing, the parties entered into an agreement under which Cortes would accept the upper term of six years on count 1 and the upper term of six years on the great bodily injury enhancement, and in exchange, the People would not seek to retry Cortes on count 2. As part of that agreement, Cortes admitted each aggravating factor alleged as to count 1. The trial court sentenced Cortes to state prison for a total term of 12 years and dismissed count 2 based on the parties' sentencing agreement. Cortes filed a timely notice of appeal.

We appointed counsel to represent Cortes on appeal. After an examination of the record, appellate counsel filed an opening brief which raised no issues and requested this court conduct an independent review of the record under *Wende*, *supra*, 25 Cal.3d 436. On May 2, 2024, we advised Cortes that she had 30 days in which to submit a supplemental brief stating any grounds for appeal or arguments that she wished for this court to consider. Cortes did not submit a supplemental brief.

7

We have examined the record and are satisfied Cortes's appellate attorney has fully complied with the responsibilities of counsel and no arguable issues exist.  (*People v. Kelly* (2006) 40 Cal.4th 106, 119; *Wende, supra,* 25 Cal.3d at p. 441.)

## DISPOSITION
The judgment is affirmed.


VIRAMONTES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.

8